IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

RAGHIB ZEITOUN, *"Gabe*;" and
EB PERFUSION LABZ, LLC                                              PLAINTIFFS

V.                                                Civil No. 2:13-cv-107-HSO-RHW

DOUGLAS SEAL; and
DSA PERFUSION, LLC                                                 DEFENDANTS

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTIONS [67, 68, 89] TO STRIKE THE AFFIDAVITS OF DANIEL WAIDE;
GRANTING DEFENDANTS' MOTION [61] FOR SUMMARY JUDGMENT
PURSUANT TO THE STATUTE OF FRAUDS; DENYING PLAINTIFFS'
MOTION [53] FOR PARTIAL SUMMARY JUDGMENT; DENYING AS MOOT
DEFENDANTS' MOTION [55] FOR PARTIAL SUMMARY JUDGMENT AS
TO CONTRACT CLAIMS; DENYING AS MOOT DEFENDANTS' MOTION
[63] FOR PARTIAL SUMMARY JUDGMENT DUE TO LACK OF
CONTRACTUAL AUTHORITY TO BIND WESLEY; GRANTING
DEFENDANTS' MOTION [57] FOR PARTIAL SUMMARY JUDGMENT AS
TO FRAUD AND MISREPRESENTATION; GRANTING DEFENDANTS'
MOTION [59] FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS'
CLAIM FOR PUNITIVE DAMAGES AND ATTORNEYS' FEES; DENYING
PLAINTIFFS' MOTIONS [47, 49] TO STRIKE DEFENDANTS' EXPERT
DESIGNATIONS OF MARY BLUMENTRITT; AND DENYING PLAINTIFFS'
MOTION [51] FOR FEES AND SANCTIONS**

BEFORE THE COURT are six Motions for Partial Summary Judgment: one

[53] filed by Plaintiffs, Raghib "Gabe" Zeitoun and EB Perfusion Labz, LLC ("EB"),

and five [55, 57, 59, 61, 63] filed by Defendants, Douglas Seal and DSA Perfusion,

LLC ("DSA").  Also before the Court are five Motions to Strike: two [47, 49] filed by

Plaintiffs and three [67, 68, 89] filed by Defendants, as well as a Motion [51] for

Fees and Sanctions, filed by Plaintiffs.  These twelve Motions have been fully

briefed.  After due consideration of the record, the submissions on file, and relevant

legal authorities, the Court finds that Defendants' Motions [67, 68, 89] to Strike the

Affidavits of Daniel Waide should be granted; Defendants' Motion [61] for Summary

Judgment Pursuant to the Statute of Frauds should be granted; Plaintiffs' Motion [53] for Partial Summary Judgment should be denied; Defendants' Motion [55] for Partial Summary Judgment as to Contract Claims should be denied as moot; Defendants' Motion [63] for Partial Summary Judgment Due to Lack of Contractual Authority to Bind Wesley should be denied as moot; Defendants' Motion [57] for Partial Summary Judgment as to Fraud and Misrepresentation should be granted; Defendants' Motion [59] for Partial Summary Judgment as to Plaintiffs' Claim for Punitive Damages and Attorneys' Fees should be granted; Plaintiffs' Motions [47, 49] to Strike the Expert Designation and Supplemental Expert Designation of Mary Blumentritt should be denied without prejudice to Plaintiffs' right to urge specific objections to Ms. Blumentritt's testimony at trial; and Plaintiffs' Motion [51] for Fees and Sanctions should be denied.

Plaintiffs' claims for an accounting and constructive trust will proceed to trial because Defendants did not request summary judgment on these claims. Plaintiffs' remaining claims for breach of contract, fraud and misrepresentation, breach of the duty of good faith and fair dealing, reformation, and tortious interference with contract will be dismissed.[1]

## I. BACKGROUND

Seal is the owner of DSA, a company that provides perfusion services on a contract basis at ten hospitals located in Louisiana and Mississippi. Dep. of Doug

---

[1]Plaintiffs pleaded estoppel as a cause of action, but estoppel is an affirmative defense. Miss. R. Civ. P. 8(c). Estoppel will be discussed in connection with Plaintiffs' breach of contract claim.

Seal [55-3] 10-11.  Perfusionists operate heart and lung bypass machines during surgical operations.  DSA entered into a Perfusion Services Agreement ("PSA") with Wesley Medical Center in Hattiesburg, Mississippi ("Wesley").  Agmt. [1-2] 14-25. The PSA was for a three-year term beginning on June 7, 2010, and continuing until June 6, 2013.  *Id.* at 15.

At the end of May 2011, DSA hired Zeitoun as a perfusionist to work with the DSA group at Wesley.  DSA paid Zeitoun a starting salary of $80,000.00 per year. Dep. of Gabe Zeitoun [61-1] 10-12, 19-20; Dep. of Doug Seal [55-3] 25.  Both Zeitoun and Seal agree that in September 2011, the two entered into discussions regarding Zeitoun "buying out" DSA's account with Wesley.  Dep. of Gabe Zeitoun [61-1] 17, 23-24; Dep. of Doug Seal [55-3] 26-31, 57.  A surgeon with Wesley, Joe Rubelowsky, encouraged Zeitoun and another perfusionist, Igor Kutsar, to take over as the group providing perfusion services to Wesley.  *Id.* at 25-28.  Zeitoun and Rubelowsky met with Seal about the idea, and Seal was receptive:

> **Plaintiffs' Counsel:** Why would you subcontract or sell a contract?  Why would you want to do that?
>
> **Doug Seal:** I've done that for another group.  I don't need everything.  I don't have to have everything.  I saw an opportunity for these guys to start their own thing. . . .
> . . .
>
> **Doug Seal:** Him – Gabe and Dr. Joe and Igor and Benjamin.  They did things their own way. . . . They had talked about it, and basically we met with Dr. Joe, Gabe and I, at the cafeteria and talked about them taking it over.
>
> **Plaintiffs' Counsel:** At any point in time did you tell Gabe how much it would cost to take over or buy out the contract?

> **Doug Seal:** We threw out some numbers to try to make it happen. Initially, Gabe actually said 100,000, and I thought about it, and I said, Gabe, it's not worth that much. So then we looked at 70,000, and then we settled on 50, and we said, "Well, the other 20, we'll look at that down the road. That's something we can look at down the road, but let's go with 50."
>
> **Plaintiffs' Counsel:** Would 50 be a good number? Why were you considering 50?
>
> **Doug Seal:** Kind of based on the Touro scheme. . . . There's no real formula for selling or, you know, changing profusion groups.

Dep. of Doug Seal [55-3] 26-29.

Seal testified that DSA provided perfusion services for Touro Hospital in New Orleans, Louisiana, from 1999 until sometime after Hurricane Katrina. *Id.* at 10, 15-18. DSA approached another perfusion group, Major Perfusion, about buying the Touro contract from DSA, and Major Perfusion did. *Id.* at 15-18.

> **Plaintiffs' Counsel:** When he bought out the contract, was that something that had to be approved by the hospital there?
>
> **Doug Seal:** Yes. It was the OR director that approved it. . . .
>
> **Plaintiffs' Counsel:** How long did it take y'all to finalize the buyout between you and Major Perfusion?
>
> **Doug Seal:** Maybe two months.
>
> **Plaintiffs' Counsel:** How much was that buyout for?
>
> **Doug Seal:** I believe it was 25,000.
>
> **Plaintiffs' Counsel:** How long was the contract?
>
> **Doug Seal:** He took it over, and I think he worked it – I

> think it was maybe eight or nine months under his name
> and then he was able to continue to get the extension. It's
> not ever guaranteed that you're going to get an extension.
> You have to get in there and work extremely hard to do
> that.

Dep. of Doug Seal [55-3] 17-18.

On April 3, 2012, a Mississippi limited liability company, EB, was created as the entity through which Zeitoun, as an employee of EB, would perform perfusion services at Wesley. Dep. of Gabe Zeitoun [61-1] 15, 29-30, 33. Zeitoun's father, Mahmoud Zeitoun, is the sole member of EB, and EB is also a Plaintiff in this case. On October 14, 2011, Zeitoun's father paid Seal $50,000.00. Wire Transfer [61-5].

Seal requested and accepted the $50,000.00 payment before approaching Wesley. Dep. of Doug Seal [55-3] 17-18, 72, 86. After Seal accepted the payment, he met with Travis Sisson, an executive at Wesley, and Sisson would not allow a "buyout" or "direct sale" of the PSA from DSA to EB. *Id.* at 51.

> **Plaintiffs' Counsel:** Did you ever tell Gabe that you
> needed to get the $50,000 in order to start moving towards
> the buyout of the Wesley contract?
>
> **Doug Seal:** We discussed some figures, but my idea all
> along was to approach Travis, like I did at Touro, and just
> suggest basically me being a lobbyist to go in and substitute
> Gabe and get him started in January [2012]. Originally, he
> did not agree with the two-week – or three-week deal. So
> then we went to an understanding between Gabe and I that
> it would start in January – basically the substitution– of me
> going in and basically mentor him, coach him, and just try
> to give him the opportunity to eventually take over the
> contract.
>
> **Plaintiffs' Counsel:** You said substitution. Is that
> basically a subcontract deal that –

**Doug Seal:** Well, no.  Just a substitute of him taking over the contract in January.  But that didn't work out.  I met with Travis; he did not go for that idea.  So we then – Gabe approached me with the subcontract idea, and that's when we decided to meet, per his request, [attorney] Mary Blumentritt and just explore that option, subcontract.
. . .

**Plaintiffs' Counsel:** What was the purpose of that $50,000?

**Doug Seal:** It was to try to get Gabe into the account.  My job was to mentor and coach him, help him set up his company.  And then his job was to perform his duties, maintain a high professional status.  I said, Gabe, you've got to make these people love you and feel that they can't do anything without you so at the end of my current term you can take over the contract.  They'll want you to get it – the hospital, the administration, the surgeons, the OR people.

**Plaintiffs' Counsel:** Did you ever email any of this to Gabe or was this verbal?

**Doug Seal:** This was verbal.

**Plaintiffs' Counsel:** If you didn't know if you could give Gabe the contract, why did you accept the $50,000?

**Doug Seal:** I told him I thought it would be the same model that it was at Touro, that I would go in there, meet with them and they would have no problem with it.  Travis did have a problem with it, so then it was going to have to be explored as something different – you know, the subcontract scenario.  Then at the end of that term, a year and a half, you know, if everything went well, then he would assume the contract.

**Plaintiffs' Counsel:** How often did you speak with Travis about substituting EB for DSA?

**Doug Seal:** I only met with him that first time, and I think I briefly saw him one time after that, but I knew he did not agree with the concept.

Dep. of Doug Seal [55-3] 30-32.

> **Plaintiffs' Counsel:** Now, why was there never a contract for the $50,000?  Why is that not written down anywhere?
>
> **Doug Seal:** Well, it was a verbal agreement, and that's the way I do everything.  I honor my verbal agreements, and I expect everyone else to honor them as well. . . . Again, I said, Gabe, this is what I'll do for you.  If we can't do it, we'll find another way to skin the cat but I will honor my commitment, but you have to honor yours.

*Id.* at 57.

> **Plaintiffs' Counsel:** But when Mike, his father, sent you the $50,000, that was to buy out the contract, wasn't it?
>
> **Defense Counsel:** Object.  It's been asked and answered.
>
> **Doug Seal:** That was to substitute EB in place of DSA starting January 2012.
> . . .
>
> **Plaintiffs' Counsel:** Didn't you at one point email Gabe and tell him y'all could go through the same kind of contract that you had used with Touro?
>
> **Doug Seal:** Well, that was something I was going to look at, and I went in there and talked with Travis and then I realized he did not want to go that route.  I don't know if he had reservations about Gabe or not at that point.  I don't know.  But I felt something there.  So, I said, Well, if there's an opportunity here for Gabe, we're going to have to revisit this and think about it.  I think it's something I can still help him with, and we will look at something else.
> . . .
>
> **Plaintiffs' Counsel:** So when you originally requested the money, the $50,000, you did so not knowing that Travis wasn't going to allow it?
>
> **Doug Seal:** Well, with the knowledge from previous experience that there weren't any issues, I was basing it on that at Touro Hospital.

*Id.* at 71-72.

> **Plaintiffs' Counsel:** When you originally accepted the $50,000, it was for a buyout of the contract, correct?
>
> **Defense Counsel:** Object to the form of the question.  It's been asked and answered more than once.
>
> **Doug Seal:** Well, originally it was going to be the scenario I had at Touro Hospital.
>
> **Plaintiffs' Counsel:** Which was for a buyout, correct?
>
> **Defense Counsel:** Same objection.  It's been asked and answered.  You can explain.
>
> **Doug Seal:** Well, it turned into something different.  It would basically be the same scenario that we had if he would have been an owner.

*Id.* at 86-87.

On approximately November 1, 2011, two weeks after Zeitoun's father paid

Seal, Zeitoun asked Seal to return the $50,000.00.  Dep. of Gabe Zeitoun [61-1] 26.

> **Doug Seal:** [Zeitoun] felt — and he said he talked to his dad and that since I couldn't make it work with a substitution come January, then I felt that he panicked.  I said, "Look, just give it some time.  We will get something rolling by January [2012]."  I said, "Help me brainstorm."  After Travis didn't want to do, you know, just a direct sale, I said let's go back to square one, and Gabe brought up the idea of a subcontract. . . .

Dep. of Doug Seal [55-3] 51.

> **Plaintiffs' Counsel:** Why didn't you just return the money when it became evident that you couldn't give him a contract?
>
> **Doug Seal:** I sent that money out to the IRS.
>
> **Plaintiffs' Counsel:** Well, I understand that, but why

didn't you just return EB Perfusion's money?

**Doug Seal:** Well, I knew we could figure something else out.  I didn't necessarily, like I said earlier, have to have that contract.  I know they were all friends.  Joe was pushing for them to take it over.  So it was like, well, why not?  Why not let them try to work something out with me.  So that was the goal was trying to work something out for me to honor my word, our verbal agreement.  If that meant – basically, he was hypothetically a business owner.  He did everything.  I coached him and everything, doing everything at the hospital.
. . .

**Plaintiffs' Counsel:** Did you ever tell Gabe that you would get him another contract?

**Doug Seal:** I told him if this doesn't work out, there's a possibility we can look at Vicksburg.  And he immediately was like, I don't want to go to Vicksburg. . . .

*Id.* at 59-60.

Zeitoun testified regarding the subcontract arrangement which began

between DSA and EB in January 2012:

**Defense Counsel:** I understand you were making a salary, correct?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** And then that changed into this verbal arrangement where you would essentially step into the shoes and be doing that work as a subcontractor?

**Gabe Zeitoun:** Well, the only reason the subcontract came in is because two weeks after payment to Mr. Seal, I approached him, [and] said, "Look, obviously something wrong's going on.  I talked to my father."  I'm like, "Look, it's best if you just give me back the $50,000.  I'd just rather be an employee of yours."  He looked at me and said, "I don't have it."  I said, "It's only been two weeks."  He said, "I don't have it.  I'll pay you 250 to 500 a month."  I said, "By the

-9-

time you pay me off, I'll be dead." . . . I just told him, I'd rather just be an employee. This had turned into a headache. . . .

Dep. of Gabe Zeitoun [61-1] 26-27.

**Defense Counsel:** What were these verbal promises and representations?

**Gabe Zeitoun:** To acquire the account from Mr. Seal and a three-year extension. A subcontracting part of the whole agreement came about because he could not supposedly negotiate the contract, so it was to be subcontracted until it was placed in EB, LLC.

**Defense Counsel:** Okay. So you said that the oral promises and representations of paragraph 9 [of Plaintiffs' Complaint] were to acquire the account at Wesley, correct?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** That was to be performed through 2013, correct?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** And the verbal promises and representations were to enable a three-year extension to be performed through 2016?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** [H]ow would it be possible for anyone to guarantee or assure a three-year extension with a third party? . . . How could Doug or anyone assure or guarantee that Gabe could get a contract with Wesley?

**Gabe Zeitoun:** The same way – he's been good friends with the CFO, Travis Sisson, for a long time. Travis has given him multiple contracts at different hospitals.

**Defense Counsel:** I understand the opportunity. I understand the odds look good, but how could it be guaranteed?

**Gabe Zeitoun:** That's what he guaranteed.  That's what he guaranteed.  If not at Wesley, at another hospital.

. . .

**Defense Counsel:** If not at Wesley, what other hospital would it be?

**Gabe Zeitoun:** He had 14 other hospitals.

. . .

**Defense Counsel:** Under this arrangement that you had where you were to be subcontracting at Wesley, what were your obligations?

**Gabe Zeitoun:** Here's the thing.  The subcontracting was not the agreement.  The agreement was to take over the contract in EB Perfusion Labz' name.  The subcontracting came because the negotiation with him and Travis supposedly didn't go right.

**Defense Counsel:** The verbal agreement that you had was to substitute EB in place of DSA in the perfusion services agreement with Wesley?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** But what you're saying is that did not happen?

**Gabe Zeitoun:** Yes, sir.

**Defense Counsel:** So what you and Doug agreed to was that EB would simply subcontract as a result and assume the obligations under the contract?

**Gabe Zeitoun:** Because of Mary Blumentritt's meeting because I was going to retain her as my own lawyer but –

**Defense Counsel:** After meeting with the attorney it was determined that since EB could not be substituted or amended into that contract that EB would just subcontract and start doing the work?

**Gabe Zeitoun:** Yes, sir.

-11-

Dep. of Gabe Zeitoun [61-1] 40-43.

In November or December 2011, DSA increased Zeitoun's salary. *Id.* at 72-73. Zeitoun testified that his salary increased to $100,000.00 per year, and Seal testified that Zeitoun's salary increased to $88,000.00. *Id.* at 31, 165; Dep. of Doug Seal [55-3] 79. Zeitoun received a bonus of approximately $15,000.00 to $18,000.00 at the end of 2011. Dep. of Gabe Zeitoun [61-1] 31-32.

> **Doug Seal:** When I felt that it wasn't going to go as planned with Travis, I gave him that other raise in December [2011] and I think January [2012] one more because I knew a month or two after that we would start the subcontract.

Dep. of Doug Seal [55-3] 80.

Zeitoun and Seal engaged the services of Mary Blumentritt, an attorney with the Hattiesburg law firm of Bryan Nelson, P.A., for the purpose of drafting a written subcontract agreement. *Id.* at 69. Seal and Zeitoun first met with Ms. Blumentritt in February 2012, four months after Seal was paid $50,000.00 by Zeitoun's father. Mary Blumentritt Dep. [55-1] 6-7. After meeting with Seal and Zeitoun, Ms. Blumentritt created a draft subcontract between DSA and EB, but it did not reference the $50,000.00 payment. Ultimately, neither the Draft Agreement nor any other written agreement was executed. Draft Agmt. [1-2]; Dep. of Gabe Zeitoun [61-1] 43, 150.

After reading the Draft Agreement, Zeitoun called Ms. Blumentritt and insisted that the contract reference the $50,000.00 payment. Dep. of Gabe Zeitoun [61-1] 145-46. Ms. Blumentritt submits that she was not told during the first

meeting with Zeitoun and Seal that $50,000.00 had already exchanged hands.

Draft Agmt. [1-2] 26-29; Mary Blumentritt Letter [1-2] 31-32; Dep. of Mary

Blumentritt [48-2] 19.  On April 4, 2012, Ms. Blumentritt advised Zeitoun and Seal

by letter that if they could completely agree to the terms, she would edit the Draft

Agreement to address the "full understanding and agreement between yourselves as

to the $50,000.00 payment and how it relates to the WMC contract, the current

term of the WMC contract and any future extensions or renewals of the WMC

contract."  Mary Blumentritt Letter [1-2] 32.  Ms. Blumentritt informed Zeitoun and

Seal that they should seek separate counsel if they could not fully agree.  *Id.* at 32.

In an email sent to Ms. Blumentritt on May 2, 2012, Seal stated, "I told [Zeitoun]

that we need to meet next week and iron out some protections that I will need to be

placed into the contract.  I am currently honoring the agreement."  Doug Seal Email

[1-2] 30.  According to Zeitoun,

> [Seal] kept mentioning if it wasn't the right time, no matter
> what he'll keep subcontracting to me until it goes into my
> name, and after that there would be a "no compete" clause
> which we had already agreed upon in front of Mary
> Blumentritt where he will not compete.  He's the mother
> company, and eventually I move him out of Mississippi. . .
> .

Dep. of Gabe Zeitoun [61-1] 150-51.

Zeitoun drew a salary from DSA until May 2012, and after May 2012,

Zeitoun was paid an equivalent salary by EB.  Dep. of Gabe Zeitoun [61-1] 165.  In

June 2012, Seal began paying EB the amount DSA received from Wesley each

month under the PSA, $21,500.00, minus DSA's expenses.  *Id.* at 90, 154-164.  Seal

retroactively paid EB in this manner for the months of January 2012 through May

2012. *Id.* at 176.

> **Plaintiffs' Counsel:** Okay.  The subcontract that you said – when Gabe took over in January, would you call your relationship between you and Gabe – would you call that a subcontractual relationship?

> **Doug Seal:** Yeah.

> **Plaintiffs' Counsel:** Did you honor that relationship?

> **Doug Seal:** Yes.  As far as my ability, I honored the verbal agreement that was basically a month-to-month, you know, evaluation to see how well he did. . . .

Dep. of Doug Seal [55-3] 33.

By the end of 2012, animosity arose between Zeitoun and Seal regarding how EB was paid, and "a couple" of complaints were made to Seal regarding Zeitoun's demeanor and reliability.  *Id.* at 33-37, 42-5.  According to Zeitoun, Seal began forwarding to EB less and less of the $21,500.00 monthly payment from Wesley to DSA.  Dep. of Gabe Zeitoun [61-1] 116-17, 154-158, 166-167.

On Friday, January 18, 2013, Zeitoun was arrested for possession of narcotics.  Dep. of Gabe Zeitoun [61-1] 46-56, 58.  Zeitoun was in jail for six days but ultimately not convicted of any crime, and he did not lose his license to practice as a perfusionist.  *Id.* at 56, 58-60, 112-113.  The day Zeitoun was arrested, Zeitoun called Rubelowsky, but he did not call Seal or anyone else with DSA.  *Id.* at 56-57.  According to Zeitoun, he did not call Seal because he did not have his cell phone and could not remember Seal's phone number.  *Id.*  Zeitoun submits that he informed Rubelowsky that it was an emergency, and "[i]f coverage is needed to call Doug, and if I don't pop up by Sunday to for sure call Doug and tell him we need coverage."

-14-

*Id.* at 57-58.  According to Seal, Zeitoun told Rubelowsky that Zeitoun's daughter had been in a car accident in Ohio, requiring Zeitoun to travel to Ohio.  Dep. of Doug Seal [55-3] 38.  Seal maintains that Zeitoun directed Rubelowsky to "push everything back to Monday, even emergencies."  *Id.* at 38-39.  Sometime over the weekend, Zeitoun's girlfriend called Rubelowsky and told him that she thought Zeitoun was in jail.  *Id.*

Unbeknownst to Seal and DSA, there was no perfusionist covering Wesley while Zeitoun was in jail over the weekend.  *Id.* at 38-39.  On Sunday, Rubelowsky called Seal and informed him that he thought Zeitoun was in jail.  *Id.* at 38.  By Monday, Seal had still not heard from Zeitoun, and DSA supplied a perfusionist to cover the Wesley contract.  *Id.* at 39.  When Zeitoun bailed out of jail on Wednesday, he called the DSA perfusionist covering for him, Hank Stan, and informed him that his daughter was "doing great."  *Id.* at 40.  Stan informed Seal of the call, and Seal called Zeitoun.  *Id.*  Zeitoun initially denied to Seal that he had been in jail, but soon recanted.  *Id.*  Zeitoun offered to come in to work, but Seal submits that he told Zeitoun to remain off the rest of the week and to come in the following week.  *Id.* at 37; Dep. of Gabe Zeitoun [61-1] 61.  Zeitoun maintains that Seal told him that it was best if he "stay[ed] away for a little bit."  Dep. of Gabe Zeitoun [61-1] 61.

On January 28, 2013, the Monday following Zeitoun's release from jail on Wednesday, Zeitoun did not show up for work at Wesley, and a perfusionist named Blyn had to call him to come in to work.  Dep. of Doug Seal [55-3] 40.  According to Zeitoun, he did not know that he was supposed to be at Wesley on Monday.  Dep. of

Gabe Zeitoun [61-1] 61.  Seal maintains that in the middle of that same week, Blyn

or Rubelowsky called him and complained about Zeitoun's "weird" behavior while

operating the pumps in the operating room.  Dep. of Doug Seal [55-3] 40, 66.  At

that point, Seal sent Stan to cover for Zeitoun, and Seal called Zeitoun and

terminated him.  *Id.*  Zeitoun covered for DSA as a perfusionist at Wesley on one

occasion after he was terminated.  Otherwise, Zeitoun's relationship with Wesley

and DSA ended on February 5, 2013.

Seal testified that he believes he fulfilled his obligations to Zeitoun under

their verbal agreement:

> **Plaintiffs' Counsel:** Wouldn't you agree that you were ultimately unable to fulfill the purpose of the $50,000?
>
> **Doug Seal:** No, I disagree.
>
> **Plaintiffs' Counsel:** Well, the $50,000 was for a perfusion contract.  Why do you disagree with me?
>
> **Defense Counsel:** Object to the form of the question.
>
> **Doug Seal:** It was to substitute him, train him, mentor him as a month-by-month basis.  Nothing's guaranteed, and I told him that.  You can't be guaranteed that contract last [sic] June 2013.  We could lose it.  What you have to do is give exemplary behavior, do your job at 110 percent and don't do anything wrong. . . . [H]e would have gotten the contract if he would have done his part of the deal.  Well, a good chance he would have, but, again, nothing is guaranteed.  We have three years we have to – you know, our contract's three years. . . .

Dep. of Doug Seal [55-3] 84-86.

B.   Procedural History

On March 19, 2013, Plaintiffs filed their Complaint against Defendants in the Chancery Court of Lamar County, Mississippi.  Pls.' Compl. [1-2].  On May 21, 2013, Defendants removed the action to this Court.  Not. of Removal [1].  Plaintiffs' Complaint advances claims for breach of contract, accounting, fraud and misrepresentation, breach of the duty of good faith and fair dealing, reformation, constructive trust, and tortious interference with contract.  Pls.' Compl. [1-2] 6-11.

## II.  DISCUSSION

A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "[i]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Melton v. Teachers Ins. & Annuity Ass'n of Am.,* 114 F.3d 557, 560 (5th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).  In deciding whether summary judgment is appropriate, the Court views facts and inferences in the light most favorable to the nonmoving party.  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 858 (5th Cir. 2010).  However, if the evidence is

-17-

merely colorable, or is not significantly probative, summary judgment is appropriate.  *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co,* 671 F.3d 512, 516 (5th Cir. 2012)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment."  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

"There is no material fact issue unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *RSR Corp.*, 612 F.3d at 858. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.  An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  *Hamilton*, 232 F.3d at 477 (citing *Anderson*, 477 U.S. at 248).  "The court has no duty to search the record for material fact issues."  *RSR Corp.*, 612 F.3d at 858.  "Rather, the party opposing summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."  *Id.*

B.   Applicable Law

The Court has original jurisdiction of this civil case because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.  28 U.S.C. § 1332(a).  The Court ordered [4] briefing on subject matter jurisdiction, and Plaintiffs and Defendants have filed Briefs [6, 7].  At the time this suit was filed, Plaintiff Zeitoun was a resident citizen of Mississippi.  Pls.' Compl. [1-2] 3.  Plaintiff EB is a Mississippi limited liability

company with one member, Mahmoud Zeitoun.  Pls.' Compl. [1-2] 1; Ex. to Defs.' Brief [6-2].  Defendants submit that Mahmoud Zeitoun is a citizen of Mississippi, Defs.' Brief [6] 1, while in a Declaration, Mahmoud Zeitoun avers that he is a citizen of Ohio, Decl. [97-3].  Defendant Douglas Seal is a citizen of Louisiana. Defs.' Brief [6] 1.  DSA is a Louisiana limited liability company, and its members, Doug and Michele Seal, are both citizens of Louisiana.  *Id.*

Where federal jurisdiction is based on diversity, the Court applies state substantive law.  *Krieser v. Hobbs,* 166 F.3d 736, 739 (5th Cir. 1999); *see Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78-79 (1938).  The parties agree that Mississippi substantive law governs this diversity case.

C.   Defendants' Motions [67, 68, 89] to Strike Daniel Waide's Affidavits

Defendants move to strike Affidavits that Plaintiffs have offered either in support of Plaintiffs' Motions or in response to Defendants' Motions.  Defs.' Mots. [67, 68, 69].  The Affidavits contain averments by Plaintiffs' counsel, Daniel Waide. Affs. of Daniel Waide [52-3, 54-5, 78-5, 80-5, 82-5, 84-5, 86-5].  In the Affidavits, Waide swears that he is in possession of a taped phone conversation between Zeitoun and Seal, wherein Seal states that the purpose of the $50,000.00 payment was for a three-year perfusion contract.  "Defendants adamantly deny that the taped conversation supports this conclusory statement, which goes to the ultimate issue."  Defs.' Mot. [67] 1.

The Court agrees with Defendants that "[i]f Plaintiffs desired for the audio recording to be considered as evidence, appropriate measures could have been taken

-19-

to introduce the same into the record." Defs.' Mot. [67] 1. The Court will not rely on Plaintiffs' counsel's interpretation of a taped conversation that is in his possession but which he did not provide to the Court. Even if the Court were inclined to accept Mr. Waide's interpretation of the taped conversation, this would not change the outcome of the Court's decisions herein. Defendants' Motions [67, 68, 69] to Strike should be granted, and Mr. Waide's Affidavits will be disregarded.

D.     Plaintiffs' Claims

    1.     Plaintiffs' Breach of Contract Claim

"The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite; (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *GGNSC Batesville, LLC v. Johnson,* 109 So. 3d 562, 565 (Miss. 2013)(internal citations omitted). "As a general rule, Mississippi law does not require that contracts be made in writing. . . . [O]ral contracts are ordinarily no less enforceable than others." *Putt v. City of Corinth,* 579 So. 2d 534, 538 (Miss. 1991).

However, Mississippi's Statute of Frauds, Mississippi Code section 15-3-1, serves as an affirmative defense to the enforcement of certain oral contracts. Under Mississippi's Statute of Frauds, there are five categories of contracts which are not enforceable unless they are in writing. One of these five categories of contracts is "[a]ny agreement which is not to be performed within the space of 15 months." Miss. Code Ann. § 15-3-1. "The possibility of performance within . . . 15 months

takes the contract out of the operation of the statute." *U.S. Finance Co. v. Barber,* 157 So. 2d 394, 397 (Miss. 1963); *see Am. Chocolates, Inc. v. Mascot Pecan Co., Inc.,* 592 So. 2d 93, 93 (Miss. 1991).

Zeitoun maintains that Seal verbally agreed to sell DSA's then-current PSA with Wesley to EB, as well as a three-year renewal of the PSA when the then-current PSA expired in June 6, 2013.  Seal admits that $50,000.00 was exchanged because of a "verbal agreement" with Zeitoun.  Dep. of Doug Seal [55-3] 57 ("Well, it was a verbal agreement, and that's the way I do everything.").  Seal acknowledged at his deposition that he accepted the $50,000,00, believing that Wesley would allow EB to buyout the remainder of DSA's PSA with Wesley, as Touro had permitted Major Perfusion to buyout DSA's perfusion services contract with Touro. Dep. of Doug Seal [55-3] 26-32.

Fifty-thousand dollars exchanged hands on October 14, 2011, DSA's PSA with Wesley expired nineteen months later on June 6, 2013, and a three-year renewal of the PSA would have expired in 2016.  Any verbal agreement to buyout the remaining nineteen months of the PSA falls within the Statute of Frauds because a nineteen-month contract cannot be performed within the space of fifteen months.  Any verbal agreement to renew the PSA also falls within the Statute of Frauds because the PSA could not renew until June 7, 2013, more than fifteen months after Zeitoun's father paid Seal $50,000.00, and the renewal itself would have lasted longer than fifteen months.  *Green v. Hartford Fire Ins. Co.,* 128 So.

107, 109 (Miss. 1930).[2]  Plaintiffs assert that the verbal agreement, as alleged by them, does not fall within the Statute of Frauds but have cited no authority supporting their position.  Pls.' Mem. [84] 10-11.  Instead, Plaintiffs primarily urge that Defendants should be estopped from asserting the Statute of Frauds as a defense.  *Id.* at 11-14.  Plaintiffs rely on the doctrines of equitable estoppel and promissory estoppel.

Under Mississippi law, "[e]quitable estoppel is a well- established exception to the statute of frauds."  *Solomon v. Walgreen Co.,* 975 F.2d 1086, 1091 (5th Cir. 1992).  "The doctrine of equitable estoppel may be used to enforce an oral contract which would otherwise be unenforceable under the statute of frauds."  *Powell v. Campbell,* 912 So. 2d 978, 982 (Miss. 2005)(citing *Koval v. Koval,* 576 So. 2d 134, 137 (Miss. 1991)).  Likewise, promissory estoppel can override the Statute of Frauds writing requirement in appropriate cases.  *Sanders v. Dantzler,* 375 So. 2d 774, 776 (Miss. 1979); *see Vannoy v. Saks, Inc.,* 87 F. App'x 349, 352 (5th Cir. 2004)(applying Mississippi law).

> Promissory estoppel legally enforces a promise made without consideration – so no contract was formed . . . . Equitable estoppel enforces an otherwise enforceable contract because one party has received a benefit under the contract, and it would be unjust to allow that party to avoid the contract's obligations due to some issue with the contract's enforcement.

---

[2]In *Green,* the Mississippi Supreme Court held that an oral agreement to keep a fire insurance policy in force and to renew the policy three years from the date thereof fell within the Statute of Frauds and was unenforceable.  128 So. at 109.

*Noble v. Wellington Assocs., Inc.,* No. 2012-CS-01269-COA,  --- So. 3d —, 2013 WL
6067991, *6 (Miss. Ct. App. Nov. 19, 2013).

A party asserting equitable estoppel must show "(1) belief and reliance on
some representation; (2) change of position as a result thereof; and (3) detriment or
prejudice caused by the change of position." *Cothern v. Vickers, Inc.,* 759 So. 2d
1241, 1249 (Miss. 2000).  "Subjective intent to mislead is unnecessary, so long as
the acts of the party sought to be estopped, viewed objectively, were calculated to
and did mislead the other party." *Christian Methodist Episcopal Church v. S&S
Constr. Co., Inc.,* 615 So. 2d 568, 571 (Miss. 1993).  Promissory estoppel requires (1)
a promise; (2) that induces action of a definite and substantial character on the part
of the promisee; and (3) that the promisor reasonably should have expected the
promisee's action.  *Dantzler,* 375 So. 2d at 776-77.  "'Detrimental reliance' is an
element of both promissory estoppel and equitable estoppel." *Nobel,* 2013 WL
6067991 at *6.  "Additionally, each of these doctrines requires reasonableness."
*Solomon,* 975 F.2d at 1091 (citing *PMZ Oil Co. v. Lucroy,* 449 So. 2d 201, 206 (Miss.
1984)).

"The law does not regard estoppels with favor, nor extend them beyond the
requirements of the transactions in which they originate." *McLearn v. Hill,* 177
N.E. 617, 619 (Mass. 1931)(cited and found consistent with Mississippi law in
*Lucroy,* 449 So. 2d at 206).  "[E]stoppel should only be used in exceptional
circumstances and must be based on public policy, fair dealing, good faith, and
reasonableness." *Powell,* 912 So. 2d at 982 (citing *Lucroy,* 449 So. 2d at 206).

"Where it would be substantially unfair to allow a party to deny what he has previously induced another party to believe and take action on, equitable estoppel may be enforced." *Christian Methodist Episcopal Church*, 615 So. 2d at 571.

This is not a case of exceptional circumstance warranting the enforcement of an otherwise unenforceable contract on the grounds of estoppel. Here, a "substitution" of EB for DSA under the PSA with Wesley required Wesley's approval. Likewise, only Wesley could award a renewal of the PSA. At the time Seal was paid $50,000.00, Plaintiffs knew that a "substitution" or renewal required Wesley's assent:

> **Defense Counsel:** [H]ow would it be possible for anyone to guarantee or assure a three-year extension with a third party? . . . How could Doug or anyone assure or guarantee that Gabe could get a contract with Wesley?
>
> **Gabe Zeitoun:** The same way – he's been good friends with the CFO, Travis Sisson, for a long time. Travis has given him multiple contracts at different hospitals.

Dep. of Gabe Zeitoun [61-1] 40-41.

Because Zeitoun knew at the outset that Wesley was the ultimate decisionmaker and the only entity that could award EB a contract with Wesley, Plaintiffs cannot establish "substantial inequity," the touchstone for application of estoppel. *Lucroy,* 449 So. 2d at 201. The absence of "substantial inequity" is further demonstrated by the fact that Plaintiffs benefitted from a subcontracting arrangement that developed between DSA and EB after Seal was paid $50,000.00. Under this arrangement, EB received $21,500.00 per month minus DSA's expenses for the time period from January 2012 through February 2013. Had EB been

"substituted" for DSA under the then-current PSA during this time period, EB's earnings would have been essentially the same.  EB would have been paid $21,500.00 per month from Wesley before expenses.  These facts do not evidence detriment sufficient to justify overriding the Statute of Frauds.  Zeitoun's own actions after his arrest, including lying about the arrest, not covering PSA duties over the weekend of his arrest, and not notifying DSA that he could not perform EB's duties over the weekend, also belie the conclusion that "estoppel would be the most fair and reasonable remedy or that injustice can only be avoided by enforcement of [Seal's] promise."  *Powell,* 912 So. 2d at 981.  Even if the circumstances here were exceptional enough to warrant application of estoppel, estoppel would not entitle Plaintiffs to the contract damages they now seek, namely "21,500 per month over a time period of 40 months."  Pls.' Compl. [1-2] 9.  Mississippi precedent indicates that reliance damages are the appropriate remedy under estoppel, not enforcement of the alleged verbal agreement.  *Powell,* 912 So. 2d at 981; *Christian Methodist Episcopal Church*, 615 So. 2d at 570, 574-76; *see Sukup Manuf. v. Rushing,* 634 F. Supp. 2d 694, 698 (S.D. Miss. June 11, 2009).

The Statute of Frauds bars enforcement of the verbal agreement alleged by Plaintiffs.  Plaintiffs' breach of contract claim should therefore be dismissed.  Because Plaintiffs' breach of contract claim should be dismissed, Plaintiffs' other contract-based claims should also be dismissed, namely Plaintiffs' claims for breach of the duty of good faith and fair dealing, tortious interference with contract, and reformation.  Plaintiffs' claims for an accounting and constructive trust will proceed

because Defendants did not request summary judgment on these claims.

In sum, Defendants' Motion [61] for Summary Judgment Pursuant to the Statute of Frauds should be granted.  Plaintiffs' Motion [53] for Partial Summary Judgment should therefore be denied.  Because Plaintiffs' contract-based claims should be dismissed pursuant to the Statute of Frauds, two other Motions are rendered moot and should be denied as moot: (1) Defendants' Motion [55] for Partial Summary Judgment as to Contract Claims; and (2) Defendants' Motion [63] for Partial Summary Judgment Due to Lack of Contractual Authority to Bind Wesley.

2.    <u>Plaintiffs' Fraud and Misrepresentation Claims</u>

Defendants generally assert that Plaintiffs' fraud and misrepresentation claims should be dismissed because Plaintiffs cannot support each element of a claim for fraudulent misrepresentation.  Defs.' Mem. [58].  Plaintiffs allege that they, "in . . . reliance upon Defendants' representations, paid Defendants $50,000" because Seal "represented to Plaintiffs that it would be no trouble for the contract to be transferred to Plaintiffs, which constitutes a material misrepresentation by Defendants."  Pls.' Resp. [79] 1-2; Pls.' Mem. [80] 1.  Plaintiffs also contend that fraud occurred because "Seal admitted in his deposition that he lied to Gabe about giving EB Perfusion another perfusion contract at a different hospital when Wesley Medical Center allegedly would not allow the perfusion contract to be transferred to EB Perfusion."  Pls.' Resp. [79] 2.  Alternatively, Plaintiffs submit that Defendants are liable for negligent misrepresentation.  *Id.* at 3.

To prevail on a claim of fraudulent misrepresentation, a plaintiff must

establish (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Martin v. Winfield,* 455 So. 2d 762, 765 (Miss. 1984). "Proving fraud is difficult, as it ought to be.  Clear and convincing evidence is required." *Id.*

Plaintiffs did not plead their fraudulent misrepresentation claims as they now argue them in response to Defendants' Motion.  Plaintiffs now claim fraud based upon Seal not approaching Wesley prior to accepting the $50,000.00, and Seal's purported promise to "giv[e] EB . . . another perfusion contract at a different hospital." *Id.* at 2.  In their Complaint, Plaintiffs' fraud claim was based upon different alleged misrepresentations:

> a.   Contrary to his representation that he was going to sub-contract the Wesley Medical Center perfusion contract to Plaintiffs, Defendants have instead refused to allow Plaintiffs to continue working at Wesley Medical Center;
>
> b.   Contrary to his representation that Plaintiffs would receive a three year extension of the perfusion contract at Wesley Medical Center, Defendants have instead taken Plaintiffs' $50,000 payment for the three-year contract and only "promised" to keep Plaintiffs "in mind" for a future contract.

Pls.' Compl. [1-2] 8.

Because Plaintiffs did not plead the fraudulent misrepresentation claims that they are now attempting to advance, Plaintiffs' fraudulent misrepresentation claims

should be dismissed.  Plaintiffs did not plead a negligent misrepresentation claim at all in the Complaint.[3]  "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."  *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)(citation omitted).  These claims cannot withstand summary judgment.

Plaintiffs' fraudulent misrepresentation claim should also be dismissed because Plaintiffs have not supplied clear and convincing evidence indicating that Seal, when he purportedly stated "that it would be no trouble for the contract to be transferred," knew that there "would be trouble."  Seal testified in his deposition that he assumed changing perfusion groups at Wesley would go as smoothly as it did at Touro.  Plaintiffs have also not provided clear and convincing evidence that Seal's purported statement that he would "keep Zeitoun in mind" for future contracts is a statement that could bind Seal or that was false when it was made.  It is undisputed that Seal mentioned the possibility of Zeitoun taking over DSA's Vicksburg contract, and Zeitoun stated that he was not interested.  Dep. of Gabe Zeitoun [61-1] 158.  Plaintiffs have furthermore not demonstrated that they had a

---

[3]Plaintiffs' misrepresentation claim in the Complaint provides that "Defendant knew that his representations were false, intended that the Plaintiff would rely on the false representations, and would be deceived by them."  Pls.' Compl. [1-2] 8.  Plaintiffs did not plead a misrepresentation claim based upon negligence.  Furthermore, Plaintiffs have not pointed to evidence in the record demonstrating that Seal misrepresented an existing fact.  "Under Mississippi law, a promise to do or to refrain from doing an act in the future does not concern an existing fact, and thus cannot support a negligent misrepresentation claim." *Pennell v. Wells Fargo Bank, N.A.,* 507 F. App'x 335, 338 (5th Cir. 2013)(citing *Bank of Shaw v. Posey,* 573 So. 2d 1355, 1360 (Miss. 1990)).

"right to rely" on Seal's alleged promises of contracts, knowing that the assent of a third party, namely Wesley or another hospital, was required.  Indeed, Plaintiffs do not even address the "right to rely" element in their briefing.  Defendants' Motion [57] for Partial Summary Judgment as to Fraud and Misrepresentation should be granted and Plaintiffs' fraud and misrepresentation claims dismissed.

3.   Plaintiffs' Claims for Punitive Damages and Attorneys' Fees

Defendants seek dismissal of Plaintiffs' claims for punitive damages and attorneys' fees on the basis that Plaintiffs have not offered "clear and convincing evidence that Defendants acted with malice, gross neglect, or reckless disregard." Defs.' Mot. [59] 2; *see* Miss. Code § 11-1-65(1)(a).  In response, Plaintiffs assert that they have supported their claim for fraud, and the jury should determine Defendants' intent after hearing all of the evidence.  Pls.' Resp. [82] 13-14.

Plaintiffs' Response is general, conclusory, and insufficient to carry Plaintiffs' summary judgment burden.  Plaintiffs contend that "Defendants . . . knew that if they did not 'cash in' with Gabe and EB Perfusion, in all likelihood, the surgeons at Wesley Medical Center would lobby for the change, and Defendants would be left empty handed."  Pls.' Mem. [83].  Plaintiffs' Response does not cite to any evidence in the record to support or explain the basis for this allegation, and while Plaintiffs cite very general standards for punitive damages, Plaintiffs do not sufficiently discuss the specific factual basis for their punitive damages claim or cite case law specific to their claim.  Generalized complaints and statements of law are insufficient to avoid dismissal at the summary judgment stage.  This is likewise

true of Plaintiffs' attorneys' fees claim.  Plaintiffs have offered no statutory,

contractual, or other applicable authority upon which an attorneys' fee award could

be based in this case.  Defendants' Motion [59] for Partial Summary Judgment as to

Plaintiffs' Claim for Punitive Damages and Attorneys' Fees should be granted and

Plaintiffs' punitive damages claim and attorneys' fees claim dismissed.

E.   Plaintiffs' Motions [47, 49] to Strike Defendants' Expert Designation and
     Supplemental Expert Designation of Mary Blumentritt

Defendants have designated Ms. Blumentritt as an unretained expert

witness in "contract law, contract negotiations, and commercial transactions."

Defs.' Expert Designs. [25, 46].  Plaintiffs move to strike Defendants' Expert

Designations of Ms. Blumentritt on the basis that Defendants are seeking to elicit

opinions from her which constitute legal conclusions on ultimate issues that are

reserved for the trier of fact.  Pls.' Mots. [47, 49].  Plaintiffs also maintain that the

Designations should be stricken because Ms. Blumentritt "never agreed to give

expert testimony in this matter," and, according to Plaintiffs, Ms. Blumentritt

testified at her deposition "that she has never given any of the opinions expressed in

the Defendants' designation of expert nor would she."  Pls.' Mem. [48] 5.  Plaintiffs

further move to strike Defendants' Supplemental Expert Designation of Ms.

Blumentritt as untimely.  Pls.' Mot. [49] 3.

In response, Defendants submit that Ms. Blumentritt

> is a fact witness to the events which gave rise to the
> purported agreement.  Defendants designated her out of an
> abundance of caution as an unretained expert in the fields
> of her expertise. Although her exact testimony will be
> unknown at trial, it is likely that she will be asked to

espouse opinions which are expert in nature.

Defs.' Resp. [73] 1-2.

Defendants maintain that the issues Plaintiffs raise with respect to Ms. Blumentritt should be carried to trial because "whether Blumentritt's testimony will be based upon pure legal conclusions, will depend on the questions asked at trial . . . ." *Id.* at 2.  As to the timeliness of Defendants' Supplemental Expert Designation, Defendants submit that the Supplemental Expert Designation should not be stricken because "a party waives any failure to timely supplement an expert opinion where the deposition was taken by agreement of the parties outside of the discovery deadline."  Defs.' Resp. [75] 2.[4]  Defendants also note that Plaintiffs do not allege that the Supplemental Designation added "any new, material opinions." Defs.' Mem. [76] 1.

Plaintiffs' request for a pretrial ruling categorically excluding Ms. Blumentritt from testifying as to legal conclusions on ultimate issues should be denied.  If Defendants should seek to elicit testimony at trial from Ms. Blumentritt that Plaintiffs contend is improper, then Plaintiffs may make contemporaneous objections, and the Court will consider those objections.  Plaintiffs filed no Reply in support of their Motion [49] to Strike Defendants' Supplemental Expert Designation

---

[4]Under certain circumstances, this Court has declined to strike a supplement to an expert designation submitted after the expert's deposition where the deposition was taken after the discovery deadline by agreement of the parties. *Previto v. Ryobi N. Am., Inc.,* No. 1:08cv177-HSO-JMR, 2010 WL 5185070, *10 (S.D. Miss. Dec. 16, 2010); *GuideOne Ins. Co. v. Bridges,* No. 2:06cv229-KS-MTP, 2008 WL 4371373, *5 (S.D. Miss. Sept. 18, 2008).

and have accordingly not rebutted the case law submitted by Defendants indicating that the Supplemental Expert Designation should not be stricken as untimely. Plaintiffs' Motions [47, 49] to Strike Defendants' Expert Designations should be denied without prejudice to Plaintiffs' right to urge specific contemporaneous objections to Ms. Blumentritt's testimony at trial.

F.   Plaintiffs' Motion [51] for Fees and Sanctions

Plaintiffs contend that Defendants should be sanctioned and Plaintiffs awarded fees because of Defendants' failure to admit certain matters in response to Plaintiffs' Request for Admissions.  Federal Rule of Civil Procedure 37 provides that

> [i]f a party fails to admit what is requested under Rule 36 and if the requesting party later proves . . . the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, included attorney's fees, incurred in making that proof.  The court must so order unless . . . (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter . . . .

Fed. R. Civ. P. 37(c)(2)(C).

Plaintiffs have not demonstrated that Defendants did not have "a reasonable ground to believe that it might prevail on the matter[s]" denied.  In response to Plaintiffs' Request for Admissions, Defendants denied that a contract or agreement existed.  As the Court has now determined, no enforceable contract existed due to the Statute of Frauds, and therefore Defendants' denials have been deemed correct. Defendants denied that they "received $50,000 from Gabe."  Defendants were correct to deny this Request as well because Zeitoun's father provided the $50,000.00 to Seal, not Zeitoun.  Plaintiffs are not entitled to fees and sanctions

pursuant to Rule 37(c)(2)(C).

Plaintiffs also request an award of all fees and costs they incurred in taking the deposition of Ms. Blumentritt and their costs and fees incurred in filing Motions [47, 49] to Strike Defendants' Expert Designations of Ms. Blumentritt.  Mot. [52] 6. Ms. Blumentritt is not only designated as an expert witness, she is, without dispute, a fact witness.  She is an attorney who was hired by Zeitoun and Seal to draft a written subcontract between DSA and EB.  Ms. Blumentritt appears here to be akin to a treating physician witness in a personal injury case, in that she has personal knowledge of facts pertinent to the case but her testimony may enter into the realm of expert testimony.  Plaintiffs chose to depose Ms. Blumentritt, and because she is a fact witness, Plaintiffs cannot claim that her deposition is without value.  In fact, Plaintiffs rely on the Draft Agreement created by Ms. Blumentritt in support of their claims.  Furthermore, sanctions and fees are not appropriate because the Court has declined Plaintiffs' request to categorically exclude Ms. Blumentritt from testifying as an expert witness.

It is true that Defendants designated Ms. Blumentritt as an expert without her prior permission, and Defendants then attributed opinions to her in their Designation of Expert Witness that she did not wholly agree with.  Plaintiffs are incorrect, however, in representing that Ms. Blumentritt totally disagreed with the opinions in the initial Designation.  Her complaints with the Designation primarily regard the verbiage and "degrees" to which the opinions were stated.

Plaintiffs cite *Saunders v. Lucy Webb Haynes-Nat. Training School,* 124

F.R.D. 3, *7 (D.D.C. 1989), in support of their contention that fees and sanctions against Defendants are mandatory here under Federal Rule of Civil Procedure 11. The court in *Saunders* was not applying the current version of Rule 11, which "was largely amended in 1993 to make it more difficult to levy sanctions." *Webb v. LaSalle,* 537 F. App'x 389, 390 (5th Cir. 2013). "The 1993 amendment to Rule 11 returned the imposition of sanctions to the discretion of the district judge . . . ." 5A Federal Practice and Procedure § 1336.1 (3d ed.). *Saunders* is not binding authority, Plaintiffs have offered no binding or current case law on the issue, and the facts in *Saunders* are distinguishable.

*Saunders* was a medical malpractice case, where expert medical testimony was required in order for the plaintiff to establish that the defendants were negligent in treating her. The plaintiff designated one of her treating physicians as an expert and stated in the designation that he would testify that the defendants violated the standard of care and were negligent in treating her. The treating physician had not agreed to give this opinion. The United States District Court for the District of Columbia sanctioned plaintiff's counsel for not making a "reasonable inquiry" under Federal Rule of Civil Procedure 11 prior to filing the expert designation.

While the Court does not condone Defendants' practice of designating a person as an expert witness without her permission and then attributing detailed and unverified opinions to her, the questionable tactics at issue here are not equivalent to the tactics of plaintiff's counsel in *Saunders*. In *Saunders,* the

plaintiff's counsel never conferred with the doctor regarding his crucial prospective testimony or even sought a copy of the doctor's medical reports addressing his treatment of the plaintiff.  Here, Defendants' Designation was based upon a detailed two-page letter written by Ms. Blumentritt to Seal and Zeitoun and also a telephone interview of Ms. Blumentritt conducted by defense counsel.  This distinction, coupled with Plaintiffs' failure to cite current law or binding authority in support of their request for sanctions and fees, guides the Court's conclusion to deny Plaintiffs' request.  Plaintiffs' Motion [51] for Fees and Sanctions should be denied.

## III. CONCLUSION

Based upon the foregoing, the Affidavits of Daniel Waide should be stricken. Plaintiffs' claims for breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, reformation, fraud, and misrepresentation should be dismissed.  Pls.' Compl. [1-2] 6-11.  Plaintiffs' claims for an accounting and constructive trust will proceed to trial because Defendants did not seek summary judgment on these claims.  Defendants' Expert Designation and Supplemental Expert Designation of Ms. Blumentritt will not be stricken, and Plaintiffs are not entitled to fees and sanctions for Defendants' purported discovery violations.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants' Motions [67, 68, 89] to Strike the Affidavits of Daniel Waide are **GRANTED**, and these Affidavits are stricken.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendants'
Motion [61] for Summary Judgment Pursuant to the Statute of Frauds is
**GRANTED**.  Plaintiffs' claims for breach of contract, breach of the duty of good
faith and fair dealing, tortious interference with contract, and reformation, are
dismissed with prejudice.  Plaintiffs' claims for an accounting and constructive trust
will proceed to trial because Defendants did not seek summary judgment on these
claims.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiffs' Motion
[53] for Partial Summary Judgment is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendants'
Motion [55] for Partial Summary Judgment as to Contract Claims and Defendants'
Motion [63] for Partial Summary Judgment Due to Lack of Contractual Authority to
Bind Wesley are both **DENIED AS MOOT**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendants'
Motion [57] for Partial Summary Judgment as to Fraud and Misrepresentation is
**GRANTED**.  Plaintiffs' claims for fraud and misrepresentation are dismissed with
prejudice.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendants'
Motion [59] for Partial Summary Judgment as to Plaintiffs' Claim for Punitive
Damages and Attorneys' Fees is **GRANTED**.  Plaintiffs' claims for punitive
damages and attorneys' fees are dismissed with prejudice.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiffs' Motions

[47, 49] to Strike the Expert Designation and Supplemental Expert Designation of Mary Blumentritt are **DENIED WITHOUT PREJUDICE** to Plaintiffs' right to urge specific contemporaneous objections to Ms. Blumentritt's testimony at trial.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiffs' Motion [51] for Fees and Sanctions is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 30th day of June, 2014.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE